IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MYLES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLANT AND CROSS-APPELLEE,

V.

WARREN E. MYLES, APPELLEE AND CROSS-APPELLANT.

Filed November 27, 2018.    No. A-17-935.

Appeal from the District Court for Deuel County: DEREK C. WEIMER, Judge. Affirmed.

Joel B. Jay, Deuel County Attorney, for appellant.

Michael D. Samuelson, of Reynolds, Korth & Samuelson, P.C., L.L.O., and, on brief, Brock J. Pohlmeier and Kyle J. Flentje, for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

INTRODUCTION

Warren E. Myles was convicted of multiple felonies, including possession of marijuana with intent to deliver and possession of a firearm during the commission of a felony, following the discovery of 10 pounds of marijuana in his vehicle during a traffic stop. On appeal, he claims that his motion to suppress should have been granted because his Fourth Amendment rights were violated, and the evidence was insufficient to sustain his conviction. We find no merit to the arguments raised on appeal and therefore affirm.

BACKGROUND

On March 4, 2016, around 8:43 p.m., Nebraska State Patrol Trooper Alex Sinnett observed a vehicle parked on the side of the interstate with its hazard lights on. Sinnett pulled behind the vehicle to perform a welfare check on the occupants and observed two males, later identified as

- 1 -

Myles and Joshua Schindler, walking toward the vehicle from the ditch on the side of the interstate. Sinnett questioned Myles about the car and his travels, to which Myles responded that they were travelling from Portland to Georgia to look for a house to buy. During this encounter, Myles struggled to respond to the initial questions Sinnett asked, and continually looked back at the vehicle and at Schindler. Sinnett noted that the vehicle had Nevada license plates, but Myles had indicated they were travelling from Portland to Georgia, which led Sinnett to believe the vehicle was a rental vehicle. These factors made Sinnett suspicious that "something else was occurring."

Sinnett informed Myles that it was illegal to stop or park on the side of the interstate, and brought Myles back to his patrol car to check his license and fill out paperwork for the traffic infraction. Once in his patrol car, Sinnett smelled marijuana odor coming from Myles' person. He asked Myles about the odor and Myles became defensive. Sinnett advised him there would be a probable cause search of his person. Shortly thereafter, Sinnett was advised by dispatch that Myles had previous charges for possession of marijuana.

After approximately 7 minutes in Sinnett's patrol car, Sinnett conducted a probable cause search of Myles. Prior to the search, Myles informed Sinnett that he had a weapon in his pocket, and that he had a concealed carry permit from Georgia. Sinnett secured the weapon and searched Myles, finding a lighter with "Stoned" printed on the side. In addition to searching Myles, Sinnett also checked Schindler's driver's license. While Sinnett was retrieving Schindler's driver's license he observed an empty holster on the floor of the vehicle that did not match the size of the firearm he had taken from Myles. When questioned about the holster and whether there were any other weapons in the car, Schindler indicated that he did not have any weapons, but he was unsure if Myles had brought "some" firearms.

Approximately 20 minutes into the stop, after Sinnett contacted Schindler in the vehicle for the first time to retrieve his license, Nebraska State Patrol Trooper Brent Potthoff arrived to assist Sinnett. Potthoff and Sinnett discussed the circumstances of the stop and Potthoff requested the Deuel County sheriff's office to deploy their canine unit to the scene despite Sinnett advising Potthoff that he "didn't have any odor at the car."

While running a check on Schindler's license in his patrol car, Sinnett questioned Myles about his trip and how he knew Schindler. Myles gave conflicting answers, stating that they were actually travelling to Portland, not Georgia, to buy a house. Further, Myles was nonresponsive in answering Sinnett's questions about his firearm or the rental vehicle, responding to questions by referencing random topics, including the high incarceration rates in the United States and his distrust of law enforcement officers. On his second contact with Schindler, Sinnett obtained the rental agreement for the vehicle, which contained both Myles' and Schindler's names, and indicated the car was rented in Portland and to be returned in Georgia. The agreement also indicated that the vehicle was rented after Myles and Schindler had been in Portland for just 12 hours.

During his conversation with Myles, approximately 33 minutes into the stop, Sinnett learned that Nebraska did not have a reciprocity agreement with Georgia for the concealed carry of weapons. When Sinnett discovered the weapon, he did not know whether Nebraska had such an agreement with Georgia regarding concealed carry licenses, and he continued to perform routine traffic stop tasks while he retrieved that information. Sinnett testified that the computer in his patrol

car had a reciprocity document and he was trying to get that pulled up. Myles was subsequently placed under arrest for having a concealed weapon.

According to Sinnett, he believed at that time he had indicators that would allow a search of the vehicle including the following: Myles struggled with simple questions; his stories did not align; the parties had a rental vehicle for a one-way trip for 3 days; the lighter in his pocket had the word "Stoned" on it; and both Myles and Schindler said the other was the driver of the vehicle. In addition, Myles had been placed under arrest.

Approximately 3 minutes after Myles was placed under arrest, the Deuel County canine unit arrived. The canine sniffed the outside of the vehicle and alerted on the trunk. Upon searching the vehicle, Sinnett discovered approximately 10 pounds of marijuana in a suitcase in the trunk. The suitcase was locked, and Sinnett had to break the lock to gain access to it. A key to the suitcase was eventually found in Myles' sock when he was searched at the county jail. In addition to the marijuana, drug paraphernalia was found in the glove compartment of the vehicle, and a firearm was found under the driver's seat. Both Myles and Schindler were arrested following the search.

Myles was charged by information with seven counts including: possession of marijuana with intent to deliver in violation of Neb. Rev. Stat. § 28-416(1)(a) (Reissue 2016), possession of a firearm during the commission of a felony in violation of Neb. Rev. Stat. § 28-1205(2)(a) (Reissue 2016), possession of more than 1 pound of marijuana in violation of § 28-416(12), failure to affix a tax stamp in violation of Neb. Rev. Stat. § 77-4302 (Reissue 2009), carrying a concealed weapon in violation of Neb. Rev. Stat. § 28-1202(1) (Reissue 2016), possession of drug paraphernalia with the intent to use in violation of Neb. Rev. Stat. § 28-441(1) (Reissue 2016), and improper stopping or parking on an interstate in violation of Neb. Rev. Stat. § 60-6,166 (Reissue 2010).

Prior to trial, Myles filed a motion to suppress the evidence seized from his vehicle, arguing that the traffic stop and search of his vehicle violated his Fourth Amendment rights. The district court denied the motion. Following a bench trial on stipulated facts, Myles was convicted on all counts contained in the information, and subsequently sentenced to 5 years of probation. The State filed a notice of appeal, intending to appeal the sentence of probation Myles received. Myles timely cross-appealed, arguing that the district court erred in denying his motion to suppress, and that there was insufficient evidence for his conviction. The State has dismissed its appeal so we address only Myles' cross-appeal.

ASSIGNMENTS OF ERROR

Myles assigns, restated, that (1) the district court erred in denying his motion to suppress the evidence seized during the traffic stop and (2) there was insufficient evidence to support his conviction.

STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, appellate courts apply a two-part standard of review. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d. 769 (2011). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment

protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Nelson, supra*. The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Woldt*, 293 Neb. 265, 876 N.W.2d 891 (2016).

In reviewing a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

ANALYSIS

(1) ALLEGED FOURTH AMENDMENT VIOLATIONS

Myles argues that his motion to suppress should have been granted because his Fourth Amendment rights were violated when Sinnett impermissibly prolonged the traffic stop by asking off-topic questions and not completing routine tasks in a reasonable fashion, and then searched his vehicle without a search warrant. We disagree.

(a) Length of Seizure

First, Myles does not dispute that the traffic stop was properly initiated by Sinnett. A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle. *State v. Nelson*, *supra*. Here, Sinnett initially stopped behind Myles' vehicle to perform a welfare check after he observed the vehicle parked on the side of the interstate with its hazard lights on. After determining that the occupants were safe, Sinnett brought Myles to his patrol car to issue a ticket for improper stopping or parking along the interstate in violation of § 60-6,166. Myles does not challenge that he committed a traffic violation; thus, the initial contact between Sinnett and Myles was justified.

Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. *State v. Nelson*, *supra*. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. *Id*. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants. *Id*. An officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

Relying upon *U.S. v. Peralez*, 526 F.3d 1115 (8th Cir. 2008), Myles argues that "Sinnett began the stop more concerned with conducting a drug-interdiction investigation than with completing a routine traffic stop." Brief for appellee at 13. In *U.S. v. Peralez*, the court addressed whether a trooper's "blended process" of conducting a drug interdiction investigation during the course of a run-of-the-mill traffic stop violated the Fourth Amendment. 256 F.3d at 1120. The Eighth Circuit concluded that because the stop did not become consensual, nor did the trooper

develop a reasonable suspicion that other criminal activity was afoot, the stop was prolonged beyond the time reasonably required to complete its purpose.

Here, however, Sinnett did develop a reasonable suspicion that other criminal activity was afoot. Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *State v. Khalil*, 25 Neb. App. 449, 908 N.W.2d 97 (2018). Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id*.

Sinnett suspected that there was criminal activity afoot based on numerous factors: the fact that Myles struggled to answer simple questions about his travel plans, the odor of marijuana coming from Myles' person, Myles' previous criminal history for possession of marijuana, the lighter with "Stoned" written on it found in Myles' pocket, Myles' inconsistent stories, both Myles and Schindler said the other was the driver of the vehicle, and the rental agreement indicating the vehicle was rented for a short duration for one way travel. Given the totality of the circumstances, Sinnett was justified in prolonging the stop to address his suspicions.

Myles argues that "Sinnett and Potthoff had already agreed to call in a K-9 officer to conduct a drug sniff of the vehicle before issuing any sort of traffic citation or warning and before determining whether the Georgia concealed carry permit of Myles was valid in Nebraska." Brief for appellee at 13. He argues that Sinnett admitted at the time the canine unit was requested that there was nothing linking marijuana to the vehicle. But even prior to initially asking Myles to accompany him to his patrol car, Sinnett was suspicious that "something else was occurring" based upon Myles' hesitant and inconsistent answers and his behavior of continually looking back at Schindler and the vehicle. The initial suspicion based on Myles' responses and behavior, the detection of the marijuana odor, and the discovery of a weapon justified the decision to have a canine unit at the scene.

These discoveries also changed the nature of the traffic stop, requiring further investigation and additional time. As recognized in *U.S. v. Peralez, supra*, if complications arise during the routine tasks, the vehicle may reasonably be detained for a longer duration than when the stop is strictly routine. Given the additional complications, it was reasonable to expand the scope of the investigation and detain the vehicle for a longer duration.

Although Myles contends that Sinnett did not act diligently to discover whether Nebraska had a reciprocity agreement with Georgia, the record does not reflect this. Although approximately 24 minutes elapsed between the time that Sinnett found the weapon and his discovery that Nebraska did not have a reciprocity agreement with Georgia, he continued to conduct his routine traffic stop procedures. This included making multiple trips to Myles' vehicle to obtain Schindler's information and the rental agreement, and asking questions of Myles regarding the nature of his trip and his relationship with Schindler. We determine that Sinnett did not unduly prolong the stop by not diligently determining whether Nebraska had reciprocity with Georgia for the concealed weapon permit.

### (b) Use of Canine Sniff

Once reasonable suspicion to support continued detention of a vehicle is determined, the next question is whether the detention was reasonable in the context of an investigatory stop. *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006). Courts consider both the length of the continued detention and the investigative methods employed. *Id*. A canine sniff is generally considered to be minimally intrusive and there is no rigid time limitation on investigative stops. *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011). The focus is on the diligence of the investigating officer and the question is how quickly he requested the canine unit and how quickly the unit was dispatched. *Id*.

At the request of Sinnett, Potthoff called for the canine unit approximately 20 minutes into the traffic stop. At this point, Sinnett was suspicious that "something else was occurring" beyond the illegal stop on the highway. Nothing in the record supports any lack of diligence on the part of Sinnett in requesting the canine unit. In fact, Myles implies that Sinnett requested it before he even had reason to do so. The canine unit arrived and sniffed Myles' vehicle approximately 3 minutes after Myles was arrested. The Nebraska Supreme Court previously has found that a 15-minute period of time from the conclusion of the traffic stop until the arrival of a drug dog was not unreasonable. *State v. Voichahoske, supra*. Further, under facts similar to the present case, this Court has determined that a 3-minute delay between the conclusion of a traffic stop and a canine sniff was reasonable. *State v. Khalil, supra*. Myles' contention that the stop was impermissibly extended to await a canine sniff is without merit.

### (c) Alleged Illegal Search

Finally, Myles argues that Sinnett searched his vehicle in violation of his Fourth Amendment rights. Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). A warrantless search of an automobile by police officers with probable cause to believe the vehicle contains contraband is permissible under the Fourth Amendment. *State v. Konfrst, supra*. Generally, the factors supporting an officer's reasonable suspicion of illegal drug activity, coupled with a well-trained drug detection dog's positive indication of drugs in a vehicle, give the officer probable cause to search the vehicle. *State v. Howard, supra*. When the police have probable cause prior to instituting any search, they may search the entire vehicle, including any package, luggage, or container that might reasonably hold the item for which they had probable cause to search. *State v. Konfrst, supra*.

Here, Sinnett had probable cause to search Myles' vehicle. The canine's alert on the trunk of Myles' vehicle, coupled with the factors giving rise to Sinnett's reasonable suspicion to detain Myles outlined above, gave Sinnett probable cause to search Myles' vehicle. Further, because Sinnett had probable cause to search the vehicle, he could also search the suitcase in which the marijuana was found. Because we find that Sinnett had probable cause to search Myles' vehicle, we do not address Myles' argument that his vehicle could not be searched as a search incident to arrest.

Finding no merit to any of Myles' arguments with respect to the Fourth Amendment, we conclude that the district court properly denied his motion to suppress.

(2) SUFFICIENCY OF EVIDENCE

Myles' second assigned error is that there was insufficient evidence to convict him of possession of the marijuana and firearm because the evidence should have been suppressed. Because we find that the district court properly denied his motion to suppress, we find no merit to Myles' argument.

Myles was convicted of numerous charges relating to the possession of the marijuana and firearm found in his vehicle. A person possesses a controlled substance when he or she knows of the nature or character of the substance and of its presence and has dominion and control over it. *State v. Rocha, supra*. Possession can be either actual or constructive, and constructive possession of an illegal substance may be proved by direct or circumstantial evidence. *Id*. The fact that one is the driver of a vehicle, particularly over a long period of time, creates an inference of control over items in the vehicle. *State v. Howard, supra*.

Here, Myles does not dispute that he possessed the marijuana and firearm seized by Sinnett; rather he contests only the lawfulness of the search of his vehicle. Having found the search lawful, we find the resultant evidence sufficient to convict Myles of the numerous charges he faced.

CONCLUSION

Having found that Myles' Fourth Amendment rights were not violated during the traffic stop, we find no error in the district court's denial of his motion to suppress. The evidence found during the search of his vehicle was sufficient to convict Myles of all charges.

AFFIRMED.